# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-325

**STATE OF LOUISIANA**

**VERSUS**

**FRANCISCO JESUS VASQUEZ-RAMIREZ**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 147463
HONORABLE MARILYN CARR CASTLE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## SHANNON J. GREMILLION
### JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, John D. Saunders, and Shannon J. Gremillion, Judges.

**Cooks, J., dissents and assigns written reasons.**

**AFFIRMED.**

**Hon. Keith A. Stutes**
**Fifteenth Judicial District Attorney**
**Ronald E. Dauterive**
**Assistant District Attorney**
**P. O. Box 3306**
**Lafayette, LA 70502**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
      **State of Louisiana**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **Francisco Jesus Vasquez-Ramirez**

**GREMILLION, Judge.**

The Defendant, Francisco Jesus Vasquez-Ramirez, appeals his conviction for Indecent Behavior with a Juvenile, a violation of La.R.S. 14:81, and his sentence of twenty years with hard labor without benefit of parole. For the reasons that follow, we affirm.

## FACTS

Alejandra Hargrave, a teacher at Ridge Elementary School in Duson, Louisiana, noticed that the victim, Y.M.R., and her sister were absent from school for three weeks before Easter 2014. When Mrs. Hargrave learned the girls were at their aunt's house in Pennsylvania, she contacted the aunt, the girls' mother (who had been deported to Guatemala), and a lawyer about obtaining guardianship of the girls. When the girls' mother signed the paperwork, Mrs. Hargrave and her husband went to Pennsylvania to get the girls. The girls returned to Louisiana the last week of May 2014. Sometime after the girls returned, Mrs. Hargrave noticed a yellow fluid on the victim's panties and noticed the victim was "itching all the time." The victim's sister told Mrs. Hargrave that the victim was sexually molested by a man at their old house.

When Mrs. Hargrave asked the victim, the victim said she was raped by a man named "Francisco." Mrs. Hargrave called the girls' mother in Guatemala and learned that Francisco's full name was Francisco Vasquez-Ramirez. According to Mrs. Hargrave, the victim said Francisco touched her vagina and "butt" with his fingers and penis. The victim told Mrs. Hargrave the touching started when she was in the second grade, which would have been in 2013. Mrs. Hargrave called the police.

Detective George Crowder with the Lafayette Parish Sheriff's Office testified that the victim told him Francisco touched her vagina every day when she and her sister came home from school. Detective Crowder witnessed the victim's Hearts of Hope interview, at which time the victim gave the same or similar statements to the interviewer.

The victim's interview took place at Hearts of Hope on August 27, 2014. The victim was eight years old at the time of the interview. The victim stated that before her present living arrangement, she lived with a lot of adult men in one house, and every day when she returned from school, one of the men touched her bottom. The victim said the man's name was Francisco, and he would touch her with his "pee pee" underneath her clothes and inside her bottom. According to the victim, it happened more than one time – every day when she came home from school. The victim's sister would also be in the room. When asked if Francisco touched her with any other part of his body, the victim said, "No." Later in the interview, the victim said Francisco used his hand to touch her in her "front bottom" and "back bottom." When asked if Francisco did anything else to make her feel uncomfortable, the victim said he kissed her on her mouth twice. At trial, the victim identified the Defendant as the Francisco that had done the things she described in her Hearts of Hope interview.

In the interview, when asked if anyone else tried to do something to her, the victim said the brother of her mom's boyfriend did the same thing to her as Francisco. The victim said it was easier to call this other person "F." When asked if "F" did the exact same thing to her as Francisco or something different, the victim said something different. The victim also said that "F" did these things to her at the same house that Francisco touched her. When asked what part of "F's" body touched her, the victim said the same as Francisco – inside her bottom and

2

her front bottom. Again, only her sister saw this happen. According to the victim, her mom was in Guatemala when this happened. The victim said that "F" was on television and was suspected of doing the same thing to other kids.

On September 25, 2014, the Defendant, Francisco Jesus Vasquez-Ramirez, was charged by bill of information with one count of molestation of a juvenile (age seven), a violation of La.R.S. 14:81.2. On October 3, 2014, the Defendant entered a written plea of not guilty to the charge. On March 30, 2015, an interpreter was appointed for the Defendant and jury selection began.

On cross-examination at trial, the victim explained that before she moved to Duson, Louisiana, she lived in North Carolina with her biological mom (Aldalena) and her biological dad (Tierfalo). According to the victim, her mom left her biological father, but she did not know why. When the victim moved to Duson in 2012, Orbelio (her mom's boyfriend) and Jaime (a male), lived in the house with her. The victim did not remember if the Defendant lived in the house at that time. Between 2012 and 2014, Felencio (the brother of her mom's boyfriend) lived in the house. When specifically asked if the Defendant was living in the house at any point, the victim said he was already living in the house when she arrived in 2012. Although the victim did not know the Defendant's name at that time, she later learned his name was Francisco Vasquez-Ramirez. The victim testified that her mom's boyfriend (Orbelio Ramirez) was the Defendant's nephew. According to the victim, the brother of her mom's boyfriend would normally open the door for them after school. When the boyfriend of the victim's mom would return from work, "Mr. Ramirez" would be with him.

On cross-examination, it was determined that the victim actually made two trips to Pennsylvania – one with her biological mom and one after her biological mom returned to Guatemala.

During defense counsel's extensive cross-examination of the victim regarding her trips to Pennsylvania, the State objected to defense counsel's "endless fishing expedition on a trip to Pennsylvania and coming back." The trial court denied the objection, finding the victim was on cross and defense counsel was not badgering the witness. Defense counsel resumed questioning the victim regarding her trips to Pennsylvania and then began questioning the victim as to the details of her life at home after her mom went back to Guatemala. During this line of questioning, the State asked to approach the bench and asserted an objection: "I want to object. We're going over a million details about what time she comes home from school, who picks her up - - " The trial court denied the objection, stating the following:

> Listen, the jury is as uncomfortable as you are. That's [defense counsel]'s deal. Okay? I know what you're saying. And I can see the face of the jury. They don't like it, either. But that's what he's doing, so he's doing it. Okay?

Defense counsel resumed questioning the victim about the details of her home life and then launched into the following colloquy:

Q.    Okay. All right. Now, let's get to the hard questions, at this point. All right? Now, you've made - - You remember the little video you did over at Hearts of Hope?

A.    (No response).

Q.    The little video you did with the young lady questioning you about some things that Mr. Ramirez allegedly done to you?

A.    Yes, sir.

Q.    All right. Now, what I want to ask you is this: When did this touching thing first start?

A.    When I was about seven years old.

Q.    Seven years old?

A.    Yes, sir.

Q. That would have been in 2013?

A. Yes, sir.

Q. Okay. Now, I know this is a hard question, but do you remember the time of the year it started? Was it in - - like, around Easter or Christmas? Thanksgiving?

A. No, sir.

Q. When did it first start?

A. I don't know, sir.

Q. You don't know?

A. No, sir.

Q. When did it end?

A. I don't know, sir.

Q. You don't know that, either?

A. No, sir.

Q. Who did you first tell this to?

A. A lady - - (Witness began to cry).

When defense counsel offered to take a break, the trial judge asked the victim if she wanted to see her mom for a minute. The victim nodded in the affirmative, and the court took a ten-minute break. At the end of the break, the State informed the court that the victim had "broken down" and could not take any further questioning. Counsel for the defense then moved for dismissal of the case. The trial court, instead, ruled that much time had been "wasted" questioning the victim about trips to Pennsylvania, and counsel's questioning of the witness was going to be limited to ten-to-fifteen minutes. The trial court further stated that more time might be allowed. Counsel objected and asked for an immediate writ of review to this court, which was denied.

5

After another break, the victim returned to the courtroom with her mother. The jury also returned to the courtroom, and the trial judge instructed the guardian to stand behind the victim while the victim sat on the stand. Defense counsel asked for a sidebar, during which time the State asked that the victim's guardian be allowed to stand behind her during the remainder of her testimony, which the trial court allowed over objection. Counsel for Defendant then elected to not proceed with further cross-examination. The State then rested, and Defendant proceeded with his defense.

Orbelio Ramirez testified that he used to be in a relationship with the victim's mom, and the victim was like his daughter. After the victim's mom returned to Guatemala, Orbelio took care of the victim and the victim's sister for approximately six months. According to Orbelio, the Defendant was his uncle, and the Defendant did not have any responsibility for taking care of the victim and her sister. Orbelio testified that he and the Defendant worked together from 7:00 in the morning until 4:00 or 5:00 in the afternoon. Sometimes Orbelio could not give the Defendant a ride home, so another person would take the Defendant home in the afternoon.

When the Defendant lived with Orbelio, there were four or five males living in the apartment. The victim, Orbelio testified, never told him the Defendant was doing something to her in a sexual way. When asked if the Defendant ever had an occasion to be alone with the victim, Orbelio replied: "Okay. I couldn't - - Honestly, I can't say that he did or didn't, because I - - It just didn't happen."

Through an interpreter, the Defendant testified at trial. He testified that he was twenty-five years old, married, with two daughters. He moved to Louisiana from Guatemala to work and support his family. When asked how he got to work, the Defendant replied that he would sometimes ride with his nephew, Orbelio. The

Defendant would get home from work by either riding with Orbelio or with other people. The Defendant normally got home between 4:00 and 5:00. When asked if he ever got home and found the victim alone, the Defendant replied, "No. I always found her with her daddy." The Defendant denied ever touching the victim improperly. When asked if he was ever alone with the victim, the Defendant replied, "I never was alone with her. In front of God, I say that. I don't understand why she's accusing me, because I don't understand that, at all."

After Defendant rested his case and arguments, the jury convicted the Defendant of the responsive verdict of indecent behavior with a juvenile under the age of thirteen. On June 25, 2015, the trial court sentenced the Defendant to twenty years at hard labor, without the benefit of parole. The Defendant orally moved for reconsideration of sentence and subsequently filed a written motion to reconsider the sentence on July 9, 2015. On July 10, 2015, the trial court denied the motion with written reasons.

## ASSIGNMENTS OF ERROR

The Defendant contends that the following errors were committed by the trial court:

> 1. The trial court erred by setting a time limitation on the defense's cross-examination of Y.M.R., thereby depriving Appellant of full cross-examination and a fair trial.
>
> 2. The trial court erred in permitting the legal guardian of Y.M.R. to stand behind her during a portion of the cross-examination of Y.M.R., thereby depriving Appellant of a fair trial.
>
> 3. The upper range sentence imposed upon Francisco Vasquez Rameriz [sic] is excessive and in violation of the Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution.

7

## ANALYSIS

Defendant argues the trial court's limitation of defense counsel's cross-examination of the victim to ten minutes interfered with his constitutional right to confront his accuser. Instead of limiting the time for cross-examination, Defendant argues, the trial court "should have allowed cross-examination to continue and, when appropriate, limit counsel from asking questions which would fit under one of the grounds noted in *Delaware v. Van Arsdall*, 475 U.S. 673 at 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)." Some of these grounds for limiting cross-examination, *Van Arsdall* stated, were "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.*, 475 U.S. at 679.[1] Defendant explains that his counsel's cross-examination in the present case was highly relevant:

> The prosecutor relied exclusively on the videotaped interview as to the allegations the child made against Appellant, and then chastised the defense for "traumatizing" the child during cross-examination, when counsel attempted to gather sufficient information to establish inconsistencies in the child's story. . . .In the forensic interview, the child said that Francisco had taken her to Pennsylvania and left her with the aunt. This act could have been construed by the jury as supervision over the child. On cross-examination, the child testified that it was Orbelio Ramirez who had taken them to Pennsylvania. . . .Counsel also questioned her in detail about what she did when she came home from school and who was present when she arrived home. Again, this line of questioning was highly relevant as Y.M.R. stated during the forensic interview that this was the time period when Francisco would touch her – everyday when she came home from school. Again, during cross-examination, she admitted that Francisco was not home during this time. She also admitted that Francisco would usually come home with Orbelio.

> Defense counsel was placed in a difficult position. Whether to question the child in detail and establish the inconsistencies and impossibilities in the child's forensic interview and suffer the wrath of the jury in putting the child through vigorous cross-examination, or

---

[1] In *Van Arsdall*, the Supreme Court found the trial court erred in refusing to allow defense counsel to cross-examine a State witness about an agreement he made with the State to dismiss an unrelated criminal charge in exchange for his testimony. The Supreme Court also found the error was subject to the harmless error analysis and remanded the case for a determination as to whether the error was harmless.

allow the interview to go unquestioned. Counsel chose to question the child in detail. Although the questioning had just gotten to the actual allegations when the child broke down, counsel had already established that Francisco did not have supervision or control over the child – an element of the charged offense. Counsel also requested a break for the child when he realized she was upset.

(Record references omitted).

Defendant further argues that had the State anticipated the victim would have difficulty on cross-examination, it could have attempted to have the victim testify by closed-circuit television as provided for in La.R.S. 15:283. Thus, Defendant argues, the trial court had other alternatives to protect the victim rather than setting a time limitation on cross-examination.

Confrontation Clause errors are subject to a harmless error analysis. *State v. Broadway*, 96-2659 (La. 10/19/99), 753 So.2d 801. We are to inquire "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684. The *Van* Arsdall court named additional factors we are to consider in making such an inquiry:

the importance of the witness' testimony in the prosecution's case,

whether the testimony was cumulative,

the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points,

the extent of cross-examination otherwise permitted, and,

the overall strength of the prosecution's case.

*Id.*

The Louisiana Supreme Court has stated the following regarding the defendant's constitutional right to confront witnesses and the trial court's responsibility to exercise reasonable control over the manner of cross-examination:

> The right to confront witnesses is ensured in both the federal and state constitutions. The Sixth Amendment to the United States Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." La.Const. art. 1, § 16 guarantees each accused the right "to confront and cross-examine the witnesses against him."
>
> This court has held that "[c]onfrontation means more than being allowed to confront the witnesses physically. 'The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'" *State v. Robinson*, 2001-0273 p. 6 (La. 5/17/02), 817 So.2d 1131, 1135, *citing Davis v. Alaska*, 415 U.S. 308, 315-316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) (internal citation omitted). Cross-examination has been termed "the principal means by which believability and truthfulness of testimony are tested." *Robinson*, 2001-0273 p. 6, 817 So.2d at 1135.
>
> Under the code of evidence, "a witness may be cross-examined on any matter relevant to any issue in the case, including credibility." La.C.E. art. 611(B). The trial court is empowered to exercise reasonable control over the manner of cross-examination so as to (1) ensure the effectiveness of the interrogation as a mode of ascertaining the truth; (2) avoid the needless consumption of time; and (3) protect witnesses from harassment or undue embarrassment. La. C.E. art. 611(A). "Subject to the discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, or discredit, the witness." *Robinson*, 2001-0273 p. 6, 817 So.2d at 1135. The ruling of the trial court as to the scope and extent of cross-examination should not be disturbed absent an abuse of the court's broad discretion.

*State v. Draughn*, 05-1825, pp. 47-48 (La. 1/17/07), 950 So.2d 583, 615-16, *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537 (2007).

However, the trial court "retains wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits" over the interrogation of witnesses. *Van Arsdall*, 475 U.S. at 679. In *State v. Hillman*, 613 So.2d 1053 (La.App. 3 Cir.), *writ denied*, 617 So.2d 1181 (La.1993), this court addressed the defendant's claim that the trial court erred in interrupting his cross-examination of the victim. Because the victim appeared to be on the verge of breaking down, the trial court recessed the victim's testimony and allowed another witness to testify.

10

After another witness testified, the victim returned to the witness stand and completed her testimony. This court found no error in the trial court's decision to interrupt the victim's testimony:

> By interrupting the cross-examination of the ten year old victim, the trial judge gave her an opportunity to regain her composure and her ability to respond to questions. This "recess" or procedure made the questioning and presentation of the victim's testimony on cross-examination more effective for the ascertainment of the truth. There is no evidence that the victim was coached in her responses during this recess, or that the timing of the recess deprived defendant of any beneficial impact of cross-examination. Trial counsel for defendant was considerate of the difficulty the ten year old victim was having trying to recall the acts of molestation, and none of the questions on cross-examination should be considered embarrassing or harassing. The unusual circumstances of this case required the trial judge to exercise his inherent judicial powers and interrupt the witness' cross-examination in order for her to regain her composure and her ability to respond to questions. The trial judge did not limit the scope of the State's or defendant's examination of the victim. We find no error in the judge's decision to interrupt the victim's testimony.

*Hillman*, 613 So.2d at 1060. Likewise, in the present case, the trial court did not limit the scope of defense counsel's cross-examination of the victim. Additionally, even though the trial court told defense counsel he would be limited to ten to fifteen minutes, the trial court also suggested that it would give defense counsel a little more time if he was in the middle of questioning the victim. There is no indication that defense counsel could not have adequately cross-examined the victim in the time allotted. As the trial court noted, Defendant had cross-examined the victim for forty-five minutes before she broke down.

In light of the above, we find this assignment of error lacks merit.

In his second assignment of error, Defendant argues that allowing the victim's legal guardian to stand behind her during the remainder of his counsel's cross examination was highly prejudicial, as it demonstrated sympathy on the trial judge's part. He argues, in essence, that this was akin to the judge commenting

upon the evidence.  We have found no cases on point in Louisiana jurisprudence, but  have found similar cases from other jurisdictions.

The Kansas Court of Appeals examined the issue closely in *State v. Rowray*, 860 P.2d 40 (Kan. Ct. App. 1993), in which the trial court had allowed the mother of two young victims (eight and six) to sit in close proximity to the victims during their testimonies.  It determined that the majority of cases have found no reversible error in allowing a parent, relative, clergyman, or even the prosecutor to accompany a young victim during testimony.  The primary consideration in such circumstances is balancing the interest of the State in having the testimony heard and protecting the witness against the possible prejudice to the defendant that might result from increased sympathy for the victim or the appearance of enhancing the victim's credibility.  *See* 82 A.L.R. 4th 1038.

The trial court in this case already noted during argument its observation that the cross examination of the victim had already engendered a great deal of apparent sympathy for the victim.  However, absent further showing on the record, we cannot say that allowing her guardian to stand behind Y.M.R. during the remainder of her cross examination was prejudicial to Defendant, as cross examination was abandoned at that point.

Louisiana Code of Evidence article 611 provides:

**A. Control by court.**  Except as provided by this Article and Code of Criminal Procedure Article 773, the parties to a proceeding have the primary responsibility of presenting the evidence and examining the witnesses.  The court, however, shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to:

(1) Make the interrogation and presentation effective for the ascertainment of the truth;

(2) Avoid needless consumption of time; and

(3) Protect witnesses from harassment or undue embarrassment.

12

Considering the control bestowed upon the trial court by La.Code Evid. art. 611, along with the sanctioning by other jurisdictions of a comfort person sitting with a child witness while the child testifies, we find the Defendant has failed to show the trial court abused its discretion in allowing the victim's guardian to sit behind the victim during her testimony.

Defendant also contests the sentence imposed by the trial court as excessive. The Louisiana Supreme Court has repeatedly admonished "that sentence review under the Louisiana constitution does not provide an appellate court with a vehicle for substituting its judgment for that of a trial judge as to what punishment is more appropriate in a given case." *State v. Savoy*, 11-1174, p. 5 (La. 7/2/12), 93 So.3d 1279, 1283 (citing *State v. Walker*, 00-3200, p. 2 (La. 10/12/01), 799 So.2d 461, 462; *State v. Cook*, 95-2784, p. 3 (La. 5/31/96), 674 So.2d 957, 959, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615 (1996); *State v. Humphrey*, 445 So.2d 1155, 1165 (La.1984)).

Even a sentence within the statutory range of sentencing can be unconstitutionally excessive if it shocks the court's sense of justice or does not meaningfully contribute to acceptable penal goals. *State v. Decuir*, 10-1112 (La.App. 3 Cir. 4/6/11), 61 So.3d 782. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061, we articulated the factors that should be considered:

> In deciding whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, an appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith,* 99-0606 (La.7/6/00); 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste,* 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is

within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook,* 95-2784 (La.5/31/96); 674 So.2d 957, 958.

In imposing sentence, the trial court noted that a presentence investigative report had been received and considered. The trial court noted that the victim was "particularly vulnerable" because of her age. Defendant had taken advantage of his position as a member of the victim's household to perpetrate the offense. The offense had seriously traumatized the victim and her family. And Defendant had continued to steadfastly deny his culpability in the face of the victim's positive identification of Defendant as the person who abused her.

Defendant filed a motion to reconsider his sentence, which the trial court denied. In denying the motion, the trial court also noted that the offense involved several incidents of abuse of the victim for which separate sentences were not imposed.

The crime of Indecent Behavior with a Juvenile, when the juvenile is under the age of thirteen, is punishable by imprisonment at hard labor of not less than two years and not more than twenty-five years, with at least two years to be served without benefit of probation, parole, or suspension of sentence. La.R.S. 14:81(H)(2). In *State v. Fregia*, 12-646 (La.App. 3 Cir. 12/5/12), 105 So.3d 999, we upheld the maximum sentence of twenty-five years for conviction of one count of Indecent Behavior with a Juvenile. The perpetrator in *Fregia* abused a four-year-old boy and a five-year-old girl over the course of several months. His sentence was imposed pursuant to a plea agreement, and the defendant benefited greatly from the agreement. In *State v. Patterson*, 09-199 (La.App. 3 Cir. 11/4/09), 21 So.3d 1119, we upheld a twenty-year sentence handed to a defendant who attempted to coerce fellatio from his twelve-year-old victim, who escaped. The

14

perpetrator was a second-felony offender. Because the twenty-year sentence was less than half what defendant could have faced, and because of the heinous nature of his offense, we found that the sentence was not reversible.

Our colleagues on the Second Circuit Court of Appeal, in *State v. Sanders*, 49,241 (La.App. 2 Cir. 10/22/14), 151 So.3d 160, *writ denied*, 14-2536 (La. 1/16/15), 157 So.3d 1133, upheld a twenty-year sentence handed to a defendant who engaged in one incident of un-coerced sexual activity with his twelve-year-old victim.

In light of the tender age of the victim; her position of vulnerability as an immigrant child whose mother had been deported from this country, leaving her in the care of her mother's boyfriend; the repeated nature of the abuse; and the effect the abuse has inflicted upon the victim, we cannot conclude that the sentence was excessive.

## DECREE

The Defendant was not deprived of his right to confront his accuser in the trial court's imposition of a time limit on his cross examination of the victim. Defendant's counsel engaged in protracted examination of the victim before the limit was placed; further, Defendant's counsel chose to discontinue his examination altogether after the limitation, which makes it difficult for us to conclude that complete cross examination could not be achieved during the time allotted. Similarly, allowing her guardian to stand behind the victim posed no undue prejudice to Defendant. The trial court must balance the interests of the State in having the testimony heard and protecting the witness against the possible prejudice to the defendant that might result from increased sympathy for the victim or the appearance of enhancing the victim's credibility. Allowing the child's guardian to stand behind her might increase the sympathy toward the victim, but

15

posed little threat in terms of bolstering her credibility.  On the other hand, the trial had already been forced to recess to allow the victim to compose herself after the lengthy cross examination.  The victim's age, vulnerability, and the repeated abuse inflicted upon her make the sentence imposed upon Defendant appropriate.

The Defendant's conviction and sentence are affirmed.

**AFFIRMED.**

STATE OF LOUISIANA

VERSUS

FRANCISCO JESUS VASQUEZ-RAMIREZ


**Cooks, J., dissenting.**

Defendant and four other men lived in the same household as the alleged victim and her younger sister. They were all Guatemalans working in the U.S. The victim's mother was in Guatemala and was not permitted to return to the U.S. after visiting her native land with her other children. The victim was left in the care of Defendant's nephew, the mother's boyfriend. She alleged Defendant began inappropriately touching her when she was in the second grade and such behavior continued for about a year every day after school. The victim testified her younger sister was sometimes present in the bedroom when Defendant engaged in the alleged behavior. Both the victim and her sister were interviewed at Hearts of Hope in 2014, after the alleged abuse was disclosed to the lady who is now the victim's foster parent. The victim was 8 years old at the time of the interview. The victim's taped interview was introduced into evidence but the interview of her younger sister was not nor was she called as a witness by the state. Defendant did not subpoena the younger sister or the tape of her interview apparently relying on the state's pretrial representations that her taped interview would be presented as evidence and she would be called as a witness for the state.

1

Defendant asserts the trial court erred in 1) severely limiting his cross-examination of the victim by imposing a ten minute time limit after he had cross-examined the victim for about 30-40 minutes; and 2) by directing the foster mother to stand behind the victim during the remaining time permitted for cross-examination. Under the limitations imposed by the trial court Defendant's attorney refused to continue to cross-examine the victim. He moved for a stay of the proceedings and an opportunity to file writs with this court on the issues concerning cross-examination of the victim but the trial court refused his request. The case proceeded without further cross-examination of the victim.

Defendant asserts he was attempting to demonstrate contradictions and inconsistencies in the victim's testimony compared to her taped interview and her in-court testimony. The record reveals, and the majority acknowledges, that during the cross-examination of the victim defense counsel obtained contradictory testimony. The victim stated in her out-of-court interview and in her in-court testimony that Defendant took she and her sister to Pennsylvania to place them in the care of their aunt. Under cross-examination of this witness it was determined that there were two trips to Pennsylvania and neither was with Defendant. One was with her mother, and one with her mother's boyfriend, Orbelio Ramirez, Defendant's nephew. The State objected during cross-examination of the child to what he termed the extensive cross-examination regarding the trips to Pennsylvania. The trial judge overruled that objection. Following that objection defense counsel moved on to questions regarding when, what time, and with whom the child would return from school. During a bench conference the state again objected to defense's cross-examination of the child because counsel was going over "a million details about what time she comes home from school, who picks

2

her up…" The trial court also overruled that objection. When defense counsel resumed cross-examination he went straight to the witness' video deposition. After a few questions on that subject defense counsel offered to take a break in the questioning apparently in deference to the young witness. The witness acknowledged she would like that. The court took a ten minute recess. Following this break, the state informed the trial judge that the witness had "broken down" and could not be subjected to any more questioning. It was at this point the trial judge came up with the notion to have the witness continue testifying with her foster mother standing behind her, and to limit the remaining cross-examination to ten to fifteen minutes. Defendant maintains he could not risk the jury being prejudiced by having the foster mother stand behind the child during the remaining cross-examination. He also asserts that severely limiting his time frame to complete cross-examination would render it ineffective. He feared continuing under these requirements would prove detrimental to his client's right to confrontation. He thus declined to continue his cross-examination of the child witness.

It is important to note in this case that the victim's recorded interview concerning the alleged abuse was introduced as evidence. There clearly was no opportunity for Defendant to cross-examine the victim in that setting. I believe this fact adds to the heightened significance of affording Defendant his right to fully and completely cross-examine this witness.

Both the U.S. Constitution and the Louisiana State Constitution guarantee criminal defendants the right to confront witnesses against them. The Louisiana Constitution specifically states: "An accused is entitled to confront *and cross-examine the witnesses against him*, to compel the attendance of witnesses, *to*

3

*present a defense*, and to testify in his own behalf." La. Const. Art. 1, § 16 (1974) (emphasis added). The Sixth Amendment to the U.S. Constitution, the Confrontation Clause, made applicable to the states by the Fourteenth Amendment, states: "In all criminal prosecutions the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Michigan v. Bryant*, 562 U.S. 344, 353, 131 S. Ct. 1143, 1152 179 L. Ed.2d 93(2012), *citing Pointer v. Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L.Ed.2d 923 (1965). The United States Supreme Court has addressed the constitutional significance of the Confrontation Clause and finds *full and complete cross-examination of a witness the very foundation of that right,* even superior to actual face-to-face confrontation in the courtroom.

In *Maryland v. Craig*, 497 U.S. 836, 845–47, 110 S.Ct. 3157, 3163–64, 111 L.Ed.2d 666 (1990) (emphasis added) Justice O'Connor, writing for the majority, in a case involving sexual abuse of a child, explained:

> The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant **by subjecting it to rigorous testing in the context of an adversary proceeding** before the trier of fact. The word "confront," after all, also means a clashing of forces or ideas, thus carrying with it the notion of adversariness. As we noted in our earliest case interpreting the Clause:
>
>> The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination **and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.** *Mattox, supra,* 156 U.S., at 242–243, 15 S.Ct., at 339–340.

4

As this description indicates, the right guaranteed by the Confrontation Clause includes not only a "personal examination," 156 U.S., at 242, 15 S.Ct., at 339, but also "(1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) **forces the witness to submit to <u>cross-examination, the 'greatest legal engine ever invented for the discovery of truth'</u>**; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." *Green, supra,* 399 U.S., at 158, 90 S.Ct., at 1935 (footnote omitted).

The combined effect of these elements of confrontation—**physical presence**, oath, **cross-examination, and observation of demeanor by the trier of fact**—serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and **subject to the rigorous adversarial testing that is the norm of Anglo–American criminal proceedings.** See *Stincer, supra,* 482 U.S., at 739, 107 S.Ct., at 2664 ("[T]he right to confrontation is a functional one for the purpose of promoting reliability in a criminal trial"); *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970) (plurality opinion) ("[T]he mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the [testimony]' "); *Lee v. Illinois,* 476 U.S. 530, 540, 106 S.Ct. 2056, 2061, 90 L.Ed.2d 514 (1986) (confrontation guarantee serves "symbolic goals" and "promotes reliability"); see also *Faretta v. California,* 422 U.S. 806, 818, 95 S.Ct. 2525, 2532, 45 L.Ed.2d 562 (1975) (**Sixth Amendment "constitutionalizes the right in an adversary criminal trial to make a defense as we know it");** *Strickland v. Washington,* 466 U.S. 668, 684–685, 104 S.Ct. 2052, 2062–2063, 80 L.Ed.2d 674 (1984).

We have recognized, for example, that face-to-face **confrontation enhances the accuracy of factfinding by reducing the risk that a witness will wrongfully implicate an innocent person.** See *Coy, supra,* 487 U.S., at 1019–1020, 108 S.Ct., at 2802 ("It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.' ... **That face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult");** *Ohio v. Roberts,* 448 U.S. 56, 63, n. 6, 100 S.Ct. 2531, 2537 n. 6, 65 L.Ed.2d 597 (1980); see also 3 W. Blackstone, Commentaries * 373–* 374. We have also noted the strong symbolic purpose served by requiring adverse witnesses at trial to testify in the accused's presence. See *Coy,* 487 U.S., at 1017, 108 S.Ct., at 2801 ("[T]here is something deep in human nature that regards face-to-face confrontation between accused

and accuser as '**essential to a fair trial in a criminal prosecution**' ") (quoting *Pointer v. Texas,* 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965)).

In *Craig,* the U.S. Supreme Court stressed the significance of "full and fair" cross-examination as the mechanism to satisfy the requirement of the Confrontation Clause:

> "[T]he Confrontation Clause is generally satisfied when the defense is given **a full and fair opportunity to probe and expose [testimonial] infirmities [such as forgetfulness, confusion, or evasion] through cross-examination,** thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony"); *Roberts, supra,* 448 U.S., at 69, 100 S.Ct., at 2540 (**oath, cross-examination, and demeanor provide "all that the Sixth Amendment demands: 'substantial compliance with the purposes behind the confrontation requirement'** ") (quoting *Green, supra,* 399 U.S., at 166, 90 S.Ct., at 1939); see also *Stincer,* 482 U.S. at 739–744, 107 S.Ct., at 2664–2667 (confrontation right not violated by exclusion of defendant from competency hearing of child witnesses, **where defendant had opportunity for full and effective cross-examination at trial**); *Davis v. Alaska,* 415 U.S. 308, 315–316, 94 S.Ct. 1105, 1109–1110, 39 L.Ed.2d 347 (1974); *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965); *Pointer, supra,* 380 U.S., at 406–407, 85 S.Ct., at 1069; 5 J. Wigmore, Evidence § 1395, p. 150 (J. Chadbourn rev. 1974).

*Maryland v. Craig*, 497 U.S. 836 at 847.

The court in *Craig* was faced with determining the constitutionality of a Maryland statute which allowed the court to permit a child witness to testify by closed circuit television based upon a showing by the state that the child witness "would suffer 'serious emotional distress such that the child cannot reasonably communicate.'" *Craig* at 856, (citations omitted). The court emphasized there must be "a case-specific finding of necessity" *Craig* at 857 (citations omitted) to justify use of the closed circuit process. It also stressed the absolute necessity of full and effective cross-examination of the child witness in such circumstances:

> In sum, we conclude that where necessary to protect a child witness from trauma that would be caused by testifying in the physical

6

presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, **ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation**. Because there is no dispute that the child witnesses in this case testified under oath, **were subject to full cross-examination**, and were able to be observed by the judge, jury, and defendant as they testified, we conclude that, to the extent that a proper finding of necessity has been made, the admission of such testimony would be consonant with the Confrontation Clause.

*Craig*, 497 U.S. at 857 (emphasis added).

Louisiana has provided by statute the procedures available to a trial court, and the level of proof needed to invoke such procedures, to protect child abuse witnesses from being further traumatized by in-court proceedings. In *State v. Carper,* 45,178 pgs. 18-20, (La.App. 2 Cir. 6/9/10, 18–22), 41 So.3d 605, 614–17, *writ denied*, 2010-1507 (La. 9/3/10), 44 So.3d 708 (emphasis added) (footnotes omitted), our sister circuit court of appeal discussed the statutory provisions as follows:

> Louisiana is one of several states that have established procedures to protect from unnecessary trauma the child victims of sexual abuse who testify at trial. See La. R.S. 15:440.1, *et seq* which provides for electronic recording of the victim's statement. See also La. R.S. 15:283, which pertains to the taking of witness testimony by closed circuit television, as well as La. Ch. C. arts. 322 to 329, which provide for both electronic recording of the victim's statement and closed circuit testimony in juvenile proceedings. However, **the jurisprudence demands that these procedures be followed with exactitude.**
>
> As discussed in *State v. Kennedy,* 957 So.2d at 773:
>
>> Louisiana is one of many states which have developed special procedures to protect child witnesses testifying about abuse from unnecessary additional trauma, allowing videotaped statements of abused children to be admitted in court, provided certain conditions are met, La. R.S. 15:440 *et seq.,* and allowing abused children to testify out of court via closed circuit television systems, La. R.S. 15:283. However, Louisiana's provisions

7

creating special arrangements for abused children contain strict requirements **designed to ensure that these accommodations do not compromise the rights of defendants to confront adverse witnesses and test the reliability of their testimony.**

In *Kennedy,* the Louisiana Supreme Court found La. R.S. 15:440.5 to be constitutional on its face and suggested that a defendant's right to confrontation was preserved so long as the witness was available to testify. The victim in *Kennedy* testified and was able to answer the vast majority of the questions asked of her.

In *State v. R.C.,* 494 So.2d 1350 (La.App. 2d Cir.1986), a videotaped interview was conducted of a five-year-old alleged victim of an attempted aggravated rape. At the trial, the victim took the stand, but refused to repeat the details of her taped interview or to answer any specific questions about the offense. The trial court ruled that the witness was unavailable to testify and the tape was inadmissible as a denial of the right of confrontation and cross-examination. The state applied for a writ.

This court in *State v. R.C., supra,* determined that the trial court correctly denied the admissibility of the videotape. We noted that, although the witness took the stand, answered general questions on direct examination and a few questions on cross-examination, she refused to talk about the alleged offense. We stated that **cross-examination cannot be effective when it is not permitted to cover the facts of the alleged offense, noting that the child's videotape lodged a devastating accusation against the defendant and the refusal to testify denied him the opportunity to probe the truthfulness of the words on the tape.**

In conclusion, we made the following observations in *State v. R.C., supra* at 1356:

> We are sensitive to the difficulty of balancing constitutional values against societal needs, especially when the needs are expressed on behalf of the youngest and most vulnerable victims of outrageous conduct. The legislature has taken innovative action in its effort to bring the wrongdoers to justice. Effective prosecution is a major part of wiping out the blight of child molestation. However, the constitutional values remain and are reflected in the statutory scheme. *Unless the statute is meticulously followed and carefully administered, the defendant's rights would be disregarded.* Here the *statutory guidelines were not followed and the trial court correctly held the videotape inadmissible.*

In *State v. Day*, 14-708 (La.App. 3 Cir. 12/23/14) 158 So.3d 120, this court upheld the trial court's refusal to appoint a third psychological expert to examine a child abuse victim to determine the need for him to testify by closed circuit television to avoid further trauma to him. The panel found there was a sufficient showing by both experts in the case regarding the necessity of such a measure and found Defendant's right to confrontation of this child witness was satisfied because "[A]ll elements of confrontation [were] preserved [during G.H.'s testimony] except the ability of [G.H.] to see the defendant and the jury." *Day* at 134, *citing State v. Daniels*, 484 So.2d 941, 944 (La.App. 1 Cir. 1986). This court recognized in *Day* what the Louisiana Supreme Court made clear in *State v. Welch*, 99-1283 (La. 4/1/00), 760 So.2d 317, echoing the holdings of the United States Supreme Court, regarding the fundamental requirement of full and effective cross-examination as the means to ensure a defendant's constitutional right of confrontation of witnesses. In *Welch* the Louisiana Supreme Court reversed the lower court's conviction for molestation of a juvenile over whom the accused had control or supervision, a violation of La.R.S. 14:81.2. In that case the defendant was placed behind a shield during the child victim's testimony. The defendant objected, but the court proceeded with the child's testimony with the defendant seated behind a shield so that the witness could not see him during his testimony. The state supreme court relied on the U.S. Supreme Court's holding and reasoning in *Craig* requiring that the state must "make an adequate showing of necessity [that] the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the

9

absence of face-to-face confrontation with the defendant." *Welch* at 321. Noting that the finding of necessity is case-specific the state supreme court held:

> **The trial court must hear evidence and determine whether the special procedure is necessary to protect the child witness from trauma caused by the presence of the defendant.** It is not sufficient for the trial court to find that the witness needs protection from courtroom trauma generally. In addition, "the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis, i.e.,* more than 'mere nervousness or excitement or some reluctance to testify.' " *Id.* at 856, 110 S.Ct. at 3169.

> In accordance with these Supreme Court holdings, the Louisiana Legislature has provided a procedure whereby a Louisiana court can order that the testimony of witnesses under fourteen years of age be taken without "face-to-face" confrontation **when the court has made a specific finding of necessity.** *See* La. R.S. 15:283. **However, neither the State nor the trial court attempted to comply with this statute, which requires expert testimony that the child would likely suffer serious emotional distress if forced to give testimony in open court and cannot reasonably communicate his testimony to the court or jury in open court.**

> We find that the procedure utilized by the trial court here violated the defendant's right to confrontation guaranteed by the Sixth Amendment as interpreted in *Coy [v. Iowa*, 487 U.S. 1012, 108 S.Ct. 2798 (1988)] and *Craig*. As can be seen from the record, *the State presented no case-specific evidence to prove the necessity of protecting this child from the trauma of testifying against the defendant. The trial court ordered the "screening" of the defendant merely on a generalized statement of possible trauma for child witnesses.*

> The violation of defendant's right to confrontation may be harmless error, *State v. Murphy,* 542 So.2d 1373 (La.1989), and is to be analyzed by assuming that the damaging potential of "face-to-face" confrontation was fully realized, then asking whether the reviewing court may conclude that the error was nevertheless harmless beyond a reasonable doubt. *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The importance of the testimony of the witness in the state's case, whether it is cumulative**, the presence or absence of evidence corroborating or contradicting the testimony, the extent of the cross-examination permitted**, and the overall strength of the state's case are factors to be considered in determining whether the error was harmless. *Id.*; *see also State v. Code,* 627 So.2d 1373, 1384 (La.1993) (noting that before a reviewing court declares an error harmless beyond a reasonable doubt it must find that the

verdict " 'actually rendered in this trial was surely unattributable to the error' ").

> In this case, the evidence, other than the victim's testimony, consisted of her hearsay statement to her young friend and the coroner's testimony that the victim's hymen was not intact. Since the coroner's evidence does not necessarily indicate the defendant's guilt, and the remaining evidence rested on the victim's credibility, "face-to-face" confrontation of the victim was extremely important. Under these circumstances, we cannot conclude that the conviction in this case was surely unattributable to the confrontation error.

*State v. Welch*, 760 So.2d. at 321–22 (emphasis added).

Likewise in this case, the trial court heard no evidence and made no attempt to determine whether this child's continued testimony in court would so seriously traumatize the child that special procedures must be invoked. In fact, the trial judge here made her decision based only on her notion that the child had become upset by testifying as a result of the ordinary trauma of the courtroom. This notion was based on the state's unsupported representation to the court that the child "had broken down" during the recess. Such was not a sufficient basis to invoke the special procedure provided by statute. Moreover, the procedure proposed by the trial court is not one provided by statute. These errors by the trial court were not harmless, as the majority concludes, but indeed completely undermined Defendant's right to confront the witness through full and effective cross-examination leaving the truthfulness of the victim's allegations untested. These errors by the trial court further harmed Defendant because it deprived him of due process and the ability to mount his defense against his accuser upon whose sole testimony his guilt or innocence was determined.

Both our state supreme court and the U.S. Supreme Court find court-induced trauma is not enough to outweigh the fundamental right to confrontation and full and effective cross-examination. The trial judge ignored the proper procedure

11

mandated by the legislature and judicially mandated by the state and federal supreme courts. It was error of law to do so. The majority recognizes these precepts, and the requirement of La.R.S. 15:283, but finds that the judge's error in this regard harmless. I wholly disagree with that conclusion and the majority's rationale. Additionally, the trial judge specifically stated defense counsel was not engaging in any conduct causing the child to get upset, and a reading of the transcript of the cross-examination of the child discloses no indication that defense counsel was other than considerate and gentle in his questioning. The method suggested by the trial judge, i.e. to have the child's foster mother stand behind her while she was cross-examined, is not one provided by law and seems to me to violate Defendant's right to confrontation and to full and effective cross-examination. Placing the foster mother behind the child would impart the same indicia of guilt which exists by placing a defendant behind a screen while a child witness testifies. There is a reason this is not the method provided by statute when the need arises to protect a child abuse victim from unnecessary trauma when testifying. And there is good reason, too, as the cases I have discussed herein demonstrate, why the need for invoking a special procedure must be established by compelling evidence through expert testimony.

In the cases in which the United States Supreme Court has addressed the confrontation clause in the context of out-of-court statements taken for use at trial, the court emphasizes the importance of the opportunity for effective cross-examination. In *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S. Ct. 1143, 179 L. Ed.2d 93(2012) (emphasis added) the court explained:

> Thus, the most important instances in which the Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to

obtain evidence for trial. See *id.,* at 43–44. Even where such an interrogation is conducted with all good faith, introduction of the resulting statements at trial can be unfair to the accused **if they are untested by cross-examination.** Whether formal or informal, out-of-court statements can evade **the basic objective of the Confrontation Clause, which is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial.**

Here the state introduced the Hearts of Hope interview of the victim as evidence at trial. The interview was conducted in the presence of the police with their assistance, and it formed the basis of the charges brought against Defendant. The use of this statement makes it all the more imperative that Defendant be afforded full and complete cross-examination of the witness in court as the only means to afford him his constitutional right to confrontation; and, under Louisiana law, his express constitutional right to cross-examine the only witness against him upon whose sole testimony his fate hangs in the balance. The state's case depends wholly on the victim's testimony. No other evidence of Defendant's guilt was introduced at trial. There was no corroborating medical evidence and no physical evidence of sexual abuse. The victim's sister was not called to testify nor was her recorded statement introduced as evidence despite the victim maintaining that her sister was present on some occasions of the alleged abuse by Defendant. The police did not question any of the other men living in the apartment with the victim and made no attempt to find the two men who fled after learning the police were looking for Defendant to question him concerning the victim's allegations.

Defendant first identified her alleged abuser as "F" stating this was the first letter of his name. During the interview at Hearts of Hope she said that the brother of her mom's boyfriend, Francisco, did the same things to her as "F" but when pressed on the subject she said Francisco (Defendant) did different things to her

13

than "F" and then proceeded to describe those different things. The record shows there were other men living in the apartment whose name began with the letter "F." Additionally, the child initially said she did not know the abuser's last name, but Defendant's last name is the same as the victim's, Ramirez. The other men living in the apartment did not have the same last name as the victim except for Defendant's nephew, Orbelio Ramirez. I think it worthy of note, too, that Defendant, although illegally in the United States, willingly presented himself to authorities upon learning they wanted to question him concerning the victim. He is the father of two children living with their mother in Guatemala and is working in the U.S. to support his family.

For the reasons stated I believe this conviction should be reversed and the case remanded for new trial.